IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 18-30062 |
| ) | |
| TROY OWSLEY, ) | |
| ) | |
| Defendant. ) | |

OPINION

RICHARD MILLS, United States District Judge:

Pending is Defendant Troy Owsley's second amended motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

I.   BACKGROUND

On August 21, 2019, after pleading guilty to Distribution of 5 Grams or More of Methamphetamine (Actual) and Distribution of 5 Grams or More of Methamphetamine (Actual), Defendant Troy Owsley was sentenced to 88 months' imprisonment followed by a 4-year term of supervised release to run concurrently.

The Defendant is a 50-year old inmate at Forest City Low FCI, Forest City, Arkansas, and is scheduled to be released from the Bureau of Prisons ("BOP") on March 1, 2025. He should be eligible for halfway house treatment in September 2024 and, potentially one year earlier, if the Defendant completes the Residential

1

Drug Abuse Program. He has incurred no disciplinary infractions while in BOP custody.

In April 2020, the Defendant began exhibiting potential COVID-19 symptoms. On April 20, 2020, medical staff determined that the Defendant was positive for COVID-19, but in remission. On July 2, 2020, the Defendant tested negative for COVID-19 after complaining of chest/shoulder pain.

The Defendant seeks compassionate release, claiming that catching COVID-19 is an extraordinary and compelling reason for an immediate sentence reduction. This global health emergency presents a serious risk to prisoners.

The Defendant's Presentence Investigation Report prepared in advance of his August 21, 2019 sentencing states that Defendant has suffered from coronary artery disease since 2005, high blood pressure and high cholesterol since 2011, and diabetes mellitus - type 2 since 2018. The Defendant has had four coronary stents placed in his heart since 2005. He suffered a heart attack in 2015 and underwent coronary bypass surgery on November 1, 2018.

According to the BOP website, 118 inmates and two BOP staff members have died of COVID-19. www.bop.gov/coronavirus (last accessed September 4, 2020). There are 1,832 federal inmates and 646 staff who are currently positive for COVID-19. *Id*. Currently, 10,729 inmates and 974 staff have recovered. *Id*. There are

126,915 inmates at BOP-managed institutions, along with approximately 36,000 staff. *Id*.

Forest City Low FCI has three inmates and six staff members who are currently positive for COVID-19. *Id*. There have not been any inmate or staff deaths due to COVID-19. *Id*. The website reports that 666 inmates and four staff members have recovered. *Id*. Forest City Low FCI has 1,781 inmates, including the 157 at the Camp. www.bop.gov/locations/institutions/for (last accessed September 4, 2020).

Since President Trump signed the First Step Act into law on December 21, 2018, defendants may now bring their motions for compassionate release after exhausting administrative remedies within the Bureau of Prisons ("BOP"). *See* 18 U.S.C. § 3582(c)(1)(A). The law provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on "extraordinary" or "compelling" reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]." *See* 18 U.S.C. § 3582(c)(1)(A).

Because the Defendant made a request to his Warden more than 30 days before the amended motion for compassionate release was filed, the Court concludes he has met the statutory exhaustion requirement.

The Court must also find that a sentence reduction is "consistent with applicable policy statements issued by the [United States] Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The First Step Act does not say what "extraordinary and compelling reasons" warrant a sentence reduction, but the compassionate release statute directs the Court to consider the sentencing factors of 18 U.S.C. § 3553(a) when deciding compassionate release motions. *See* 18 U.S.C. § 3582(c)(1)(A).

The Defendant notes that he has already suffered a dangerous attack on his health that BOP could have prevented with more care. He did not get even one test before he was sick. The Defendant claims that any rational jailer would have tested repeatedly to stop the spread before an outbreak began.

## II.   DISCUSSION

### (A)

Since passage of the First Step Act, the Sentencing Guideline policy statement has not been updated to reflect that defendants (and not only the BOP) may move for compassionate release but courts have turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence

reduction. *See United States v. Weatherspoon*, 2020 WL 3803035, at *3 (S.D. Ind. July 7, 2020) (citations omitted). The applicable guideline instructs that the Court should consider the sentencing factors set forth in 18 U.S.C. § 3553(a) when deciding a motion for compassionate release and the Court should not grant a sentence reduction if the defendant poses a risk of danger to the community, as defined in the Bail Reform Act. *See* U.S.S.G. § 1B1.13. The policy statement provides examples of "extraordinary and compelling reasons" in the application notes. These examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1 (A)-(C). The Government contends that Defendant cannot meet these "extraordinary and compelling reasons" which would warrant release.

The commentary also includes a fifth catch-all provision for "extraordinary and compelling reasons other than, or in combination with, the reasons described in subdivisions (A) through (C)," as determined by the Bureau of Prisons. The policy statement was last updated in November 2018 before the First Step Act was passed.

On April 3, 2020, the Attorney General made the finding that emergency conditions are materially affecting the functioning of the BOP, thereby allowing the BOP Director to review all inmates for home confinement. The Attorney General's

Memorandum explained that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations." There have been calls from legal experts for the Attorney General to expand the home confinement program even further. Moreover, multiple United States Senators have recently voiced concern over BOP's attempts to curb the spread of the virus and their non-responsiveness to the call to release medically vulnerable inmates.

Certainly, the COVID-19 pandemic is in and of itself an extraordinary and unprecedented event in our lifetimes. "The spread of the novel coronavirus, more specifically COVID-19, has presented extraordinary and unprecedented challenges for the nation and poses a serious issue for prisons." *United States v. Coles*, 2020 WL 1976296, *6 (C.D. Ill. Apr. 24, 2020). However, "the mere existence of COVID-19 in society and possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). "Perhaps a prisoner could satisfy the extraordinary and compelling reasons requirement by showing that his particular institution is facing a serious outbreak of COVID-19 infections, the institution is unable to successfully contain the outbreak, and his health condition places him at significant risk of complications should he contract the virus." *United States v. Melgarejo*, 2020

WL 2395982, at *3 (C.D. Ill. May 12, 2020); *see also United States v. Johnson*, 2020 WL 2573239, at *4 (C.D. Ill. May 21, 2020).

The Defendant notes that conditions of imprisonment create an ideal environment for the transmission of contagious diseases—as had been demonstrated by the number of cases in the COVID-19 positive ward at Forest City Low FCI at the time of the Defendant's motion. The CDC has recognized the difficulty of preventing the introduction of COVID-19 into the prison setting. This is due to crowding, inadequate ventilation and security issues. Additionally, incarcerated individuals tend to be in poorer health than the general population.

(B)

The Court earlier noted the number of positive cases that have occurred throughout BOP and at Forest City Low FCI. As the Defendant points out, the true numbers are unknowable because of a lack of testing at his facility and others. Moreover, jail protocols cannot protect high-risk individuals from substantial harm from COVID-19.

The Defendant further reports that COVID-19 prisoners like him have not received any sort of "specialized" care beyond placement in a sick ward. He waited days—while positive for COVID-19 to see a doctor for breathing problems. BOP

was unable to protect the Defendant from COVID-19. Accordingly, courts should recognize the critical importance of reducing incarcerated populations.

Under *Pepper v. United States*, 562 U.S. 476, 490-493 (2011), the Court should consider post-offense developments along with other relevant § 3553(a) factors. The Defendant contends that the § 3553(a) factors can be met by an order of home confinement as a condition of supervised release. Moreover, the fact that he got COVID-19 is a severe sanction which, the Defendant alleges, constitutes an extraordinary reason to grant compassionate release at some point. The Defendant reports suffering the following symptoms after his COVID-19 positive test: (1) difficulty breathing; (2) chest pain (racing and fluttering); (3) severe headaches; (4) pain in his feet; and (5) thickening in his lower eye lids.

The Defendant appears to suffer from at least two conditions that place him at an increased risk of severe illness from COVID-19—coronary artery disease and Type 2 diabetes mellitus. www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions (last visited August 31, 2020). Hypertension might place him at an increased risk. *Id*. Accordingly, the Defendant does have a number of serious medical conditions.

It is also worth noting that much is unknown about what happens to individuals in the months and years after contracting the virus, including how it

affects life expectancy and whether there are any long-term health effects. Given these uncertainties and the fact that he contracted COVID-19 while in BOP custody, the Defendant alleges that his prison term should be reduced.

The fact that Defendant was subjected to COVID-19 while in BOP custody is terrible—just as it is for the more than 12,000 inmates who have had or currently have COVID-19. Tragically, more than 100 BOP inmates have died from COVID.

Obviously, every BOP facility has had to deal with the threat or existence of COVID-19. Some institutions have done better than others at containing the spread. Given that more than one-third of the inmates at Forest City FCI Low have tested positive from COVID-19, it is fair to say that Forest City was not one of the more successful BOP facilities at mitigating the spread. However, the situation now appears to be under control with three inmates who are currently positive along with six staff members.

The Court recognizes—as the Defendant points out—that the long-term effects of COVID-19 are unknown. While the Court notes that there is no proven immunity effect after recovery, studies would appear to show that the Defendant is not likely at risk of contracting COVID-19 again. Recent studies suggest that "most patients who recover have neutralizing antibodies—the type of antibody that confers immunity and protects people from getting sick again." www.healthline.com/health-

news/people-reinfected-with-covid-19-werent-infectious "The report also found that the vast majority of recovered patients (96 percent) had neutralizing antibodies, indicating that they conferred immunity." *Id*.

The Defendant has a number of serious medical issues that would potentially place him at risk. However, the situation at Forest City Low FCI is much better than it was at the time of the Defendant's motion. Moreover, it would appear that Defendant is not likely at risk of contracting COVID-19 again.

Additionally, the record in this case suggests that Defendant remains a risk to reoffend. At his Initial Appearance and Arraignment in November 2018, the Defendant was released on bond. Two months later, a Petition for Action on Conditions of Supervised Release was filed wherein it was alleged that Defendant had tested positive for methamphetamine on two occasions. In January 2019, the Defendant was permitted to remain on bond.

On February 6, 2019, a Second Petition for Action on Conditions of Pretrial release was filed wherein it was alleged that Defendant had again tested positive for methamphetamine. The Court found that Defendant had violated his conditions of supervised release and revoked his bond.

The PSR also reports that, in 2015, the Defendant's state court probation in connection with a Driving While Revoked Offense was revoked after, *inter alia*, he tested positive on two occasions for methamphetamine.

Even if the Defendant's health issues along with the fact that he previously contracted COVID-19 at Forest City Low FCI constituted extraordinary and compelling reasons that might warrant a reduction in certain circumstances, the Court is unable to conclude that the sentencing factors under § 3553(a) would support a reduction in these circumstances. The Defendant's recent history while out on bond or on probation suggests he remains a threat to reoffend. Relatedly, it is unlikely that the service of less than one quarter of his imprisonment term would adequately deter further criminal conduct. Moreover, the protection of the public from further crimes remains a concern.

Based on the foregoing, the Court is unable to conclude that compassionate release is warranted.

<u>Ergo</u>, the Defendant's Second Amended Motion for Compassionate Release [d/e 49] is DENIED.

ENTER: September 4, 2020          FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge